IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
HELENA DIVISION

IN RE: HOFFINGER INDUSTRIES, INC., DEBTOR      CASE NO. 01-20514
     CHAPTER 11

**PROPONENTS CREDITOR LEESA BUNCH, CREDITOR McMASKER
ENTERPRISES, BY SUBROGEE FARMERS INSURANCE GROUP, AND
PARTIES IN INTEREST NORTH AMERICAN POOL COMPANY AND
CORNELIUS POOLS, LLC, OF ALTERNATIVE COMPETING PLAN OF
REORGANIZATION OBJECTION TO CONFIRMATION OF
DEBTOR'S AMENDED PLAN OF REORGANIZATION**

COME the Proponents of the Alternative Competing Plan of Reorganization ("the
Alternative Plan"), Creditors Leesa Bunch ("Bunch"), McMasker Enterprises, Inc., and Farmers
Insurance Group as subrogee of McMasker Enterprises, Inc. ("McMasker"), and, parties in
interest, North American Pool Company, A Nova Scotia Unlimited Liability Company, d/b/a
Cornelius Industries and its wholly owned subsidiary, Cornelius Pools, LLC, a California
Limited Liability Company ("Cornelius"), collectively the Proponents of the Alternative Plan
(formerly known and referred to as the Creditors' Plan of Reorganization prior to the change of
title and designation) ("Proponents"), by their respective undersigned attorneys and for their
Objection to Confirmation of Debtor's Amended Plan of Reorganization, state:

## I. INTRODUCTION AND BACKGROUND

1.     Debtor filed this Chapter 11 case on September 13, 2001, and has been in possession of
its business, property, and assets since that date in accordance with Sections 1107 and
1108 of the Bankruptcy Code.  No application for a Trustee or Examiner is pending.  In
February, 2002, in settlement of the Bunch/McMasker Application for Appointment of an
Examiner, a local certified public accountant was appointed on behalf of the Official
Unsecured Creditors' Committee to make an examination of Debtor's financial affairs and
condition and to submit a written report of the findings/conclusions.  Such report was not
completed until March, 2003, in part due to delays in documents being furnished to the

retained professional.

2.  Debtor filed its Amended Plan of Reorganization ("Debtor Amended Plan") and
Amended Disclosure Statement on or about July 19, 2004, following five (5) extensions
of the statutory Exclusivity Periods set forth in Section 1121 of the Bankruptcy Code.
Debtor's original Plan of Reorganization and Disclosure Statement were filed on May 1,
2003, on the last day of the Third Extension of the statutory Exclusivity Periods.

3.  At a hearing on August 20, 2004, before this Court on the adequacy of Debtor's First
Amended Disclosure Statement following the required notice under FRBP 2002 and
3017, the Court conditionally approved the Amended Disclosure Statement as being
"adequate" for purposes of compliance with Section 1125 of the Bankruptcy Code, as
amended, subject to Debtor supplementing the contents of that document as agreed to in
open court, and further subject to the Proponents timely submitting additional disclosures
to Creditors which they wanted added.  This Court entered a written Order memorializing
its rulings on September 7, 2004.   The Proponents timely submitted to Debtor's counsel
the requested additional disclosures, which were included as part of the final document.

4.  Upon information and belief, Debtor has now mailed on or about September 17, 2004,
the Debtor Amended Plan and the Amended Disclosure Statement, as revised in
accordance with the above Order, together with ballots and other materials to all
Creditors and parties in interest as required by FRBP 2002(b)(g)(i)(j) and 3017(d).

5.  In a mailed separate Notice of Deadline for Casting Votes to Accept or Reject the Plan,
Deadline for Filing an Objection to Confirmation of Plan, Hearing to Consider
Confirmation of Plan, Plan Channeling Injunction, and Injunctions ("the Notice of
Deadline"), the date for objections to confirmation of the Debtor Amended Plan and for
casting ballots for or against the Debtor Amended Plan is October 15, 2004.  In the
Notice of Deadline, Debtor strongly recommends that Creditors vote to accept the Debtor
Amended Plan.

6.    Upon information and belief, ballots have been sent to Creditors and parties in interest soliciting votes in favor of the Debtor Amended Plan.  The balloting process is, therefore, underway.  Proponents Bunch and McMasker have cast ballots rejecting the Debtor Amended Plan.  Proponent Cornelius is not a creditor of Debtor and has no vote.  But Proponent Cornelius is a party in interest with standing to object to Confirmation of the Debtor Amended Plan.

7.    Objections to confirmation of a Chapter 11 Plan, per the Notice of Deadline and applicable law, shall be filed and served as required by FRBP 3020(b) by October 15, 2004, at 5 p.m. CDT.

8.    This Court has set November 22, 23, and 24, 2004, if necessary, as hearing dates on confirmation of the Debtor Amended Plan.

9.    The Proponents filed on September 3, 2004, a Motion for Consideration and Determination of the Preferences of Creditors and Equity Security Holders, if Applicable, in Confirming a Plan of Reorganization.  This Motion was denied at a hearing held on September 30, 2004.  The Proponents filed their original plan of reorganization and disclosure statement on August 12, 2004, and pursuant to rulings of the Court, filed the Alternative Plan and Alternative Plan Disclosure Statement dated October 14, 2004, on October 15, 2004.

10.   This Court has set December 15, 16, and 17, 2004, if necessary, as hearing dates on confirmation of the Proponents' Alternative Plan, if the Debtor Amended Plan is not confirmed prior thereto.

## II.  BASIS FOR PROPONENTS' OBJECTION TO CONFIRMATION OF THE DEBTOR AMENDED PLAN

**A.    Improper Classification of Class I Claims.**

11.   The Class I Claims are addressed and treated in paragraph 4.09 of the Debtor Amended Plan.  The Debtor Amended Plan impermissibly classifies in violation of 11 U.S.C. §

1122 and applicable case law the timely filed liquidated non-contingent personal injury Claims of Bunch and McMasker with several unliquidated and contingent personal injury Claims, all in clear violation of 11 U.S.C. § 1122(a). Only the Bunch and McMasker Claims have been litigated to judgment in state court. Liability and damages for each Claim have both been fixed by a jury. Bunch has timely filed a secured and unsecured liquidated non-contingent personal injury Proof of Claim in this case in the amount of $13,778,466.00. McMasker has timely filed an unsecured personal injury Proof of Claim for indemnity in this case in the amount of $1,225,000. Each Claim arises out of a personal injury, rendering her a quadriplegic, suffered by Bunch in August, 1993, in connection with the use of a Hoffinger made pool liner. The fact that these Claims are on appeal to the California Court of Appeal do not cause them to be contingent or unliquidated.

This Court by Opinion and Order dated August 27, 2004, in certain preference litigation brought by Debtor against Bunch and McMasker in AP No. 2:03-ap-1134, determined that each Claim was unsecured as the result of each claimant having received a preference avoidable by Debtor under 11 U.S.C. § 547 and § 550. The Court's Opinion and Order has been appealed by Bunch and McMasker to the U.S. District Court for the Eastern District of Arkansas. Debtor has filed a Cross Appeal from said Opinion and Order. An appeal by the losing party to the Eighth Circuit Court of Appeals is likely. Such ruling and appeals do not cause either Claim to be contingent or unliquidated.

12. Under 11 U.S.C. § 1122(a), a Plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

13. Class I in the Debtor Amended Plan consists of the Unsecured Claims of (a) Tommie Rousse, (b) Christopher Lynn Reneau, (c) Matthew Brock and Catherine Brock, (d) Ross William Riddy, (e) Mr. B's Pool Centers, Inc., (f) McMasker, (g) the unsecured portion

4

of the Allowed Bunch Claim, and (g) the Claims of all other Unliquidated Personal Injury Claimants. The background and alleged amount of each Claim is not identified or otherwise disclosed. No estimate of the amount each unliquidated Claim is provided, notwithstanding Debtor has this information per an expert report. Debtor, in specific terms, fails to mention and provide for in its Debtor Amended Plan a seriously injured individual, a Mr. Hemstreet, believed to be a resident of British Columbia, in connection with the indemnity Claim of Ross William Riddy, believed to be a dealer or distributor of pool products in British Columbia. Upon information and belief, Mr. Hemstreet was rendered a quadriplegic as a result of using a Hoffinger-produced pool without a warning label. This Claim, like the other known personal injury Claims of other Class I members, is considered a Bucket A Claim in the Charles Pearl Report. The omission of specific treatment/analysis of this unliquidated Claim is made more serious since neither experts Pearl or Azzara have analyzed this Claim. Thus, the expected size of Class I for estimation and distribution purposes is impacted by this omission.

14.     The purported Personal Injury Unsecured Claims of each individual or entity in Class I, other than Bunch and McMasker, have not been adjudicated or liquidated as to liability or damages for purposes of allowance and payment by any state or federal court, by this Court, as a result of any arbitration proceeding, or otherwise. Not only does the stayed Claim of each individual or entity, other than Bunch and McMasker, involve or relate to personal injuries of apparent varying severity suffered at different times and places over the years and in jurisdictions different from the Claims of Bunch and McMasker in California, but each of said Claims differs, or may differ based on the information received to date, materially in permanency of injury, the amount of incurred and future medical, and venue. Some or all of the non-Bunch and non-McMasker Claims arise under laws of jurisdictions (U.S. and Canadian) mostly less favorable to plaintiffs than the tort laws in California. At least one Personal Injury Products Liability Claim

(Hemstreet or Riddy) has been filed against Debtor in a British Columbia Court under Canadian law and is pending outside the United States.  Information available to the Proponents indicates this injury to a male in his 20's (a Mr. Hemstreet), resulted in his being rendered a quadriplegic with alleged economic damages as much as $5 million, but subject to reduction for comparative fault.  Little formal discovery in litigation or in depth investigation, upon information and belief, has been done for any of the non-Bunch and McMasker Claims.  None of these Claimants, except Brock in a late September filing, has requested relief from the stay to liquidate their Claims in a non-bankruptcy forum.  The Brock Motion for Relief From Stay has been set for hearing on October 28, 2004.

15.     Under no circumstances whatsoever, based on the information presently available to Proponents, are the Claims of the other purported members of Class I substantially similar to the Claims of Bunch and McMasker.  The only common element is that they allegedly arose out of the purported use, either Pre-Petition or Post-Petition, of one of Debtor's defective products.  Therefore, the unliquidated and non-contingent Claims of Bunch and McMasker, each arising out of the same personal injury in August, 1993, but unrelated by time, location, venue, degree of severity (except for other Claims involving a quadriplegic status) degree of permanency, and the amount of incurred and future medical to any of the other Class I Claims, are not substantially similar, and cannot remain in Class I.  Therefore, must be classified separately in their own Class.  Section 1122 (a) of the Bankruptcy Code has been violated, rendering the Amended Debtor Plan unconfirmable.

**B.      Discrimination in Payment of Class I Claims.**

16.     The treatment provided for partial payment of the Class I Claims, as set forth in paragraphs 9.02 and 9.03 of the Debtor Amended Plan, is unequal and discriminatory, and therefore, unduly prejudicial.  The pro rata payments to any holder of an Allowed

Class I Claim are dependent solely upon the speed by which any Class I member becomes the holder of an Allowed Claim.  Legitimate Class I Claimants that are allowed Claims at a time after the Products Liability Fund is fully funded and then depleted by payment, i.e. holders of "Excess Class I Allowed Claims", as defined in the Debtor Amended Plan, will not receive payment except in five (5) equal installment payments without interest, with the first installment being paid on July 31 of the year following the later of the Effective Date and the date any such Claim becomes an Allowed Claim.  Earlier Allowed Claims that exist at the time of the Effective Date or at any time during the first five (5) year period during which the Products Liability Fund will be fully funded will be paid sooner, but in varying amounts pro rata annually depending upon when each is allowed, from the Products Liability Fund.

17.    As an example, an Allowed Class I Claim in excess of $50,000, but less than $550,000, that exists on the Effective Date will be paid following (a) receipt of the Fully Funded Amount and (b) the  determination of the applicable Net Products Liability Indemnification Proceeds, if any, for that Allowed Claim on a pro rata basis annually during each of the first five (5) years, during which the Products Liability Fund is fully funded by Debtor to the full extent of $3,000,000 (i.e. $600,000 annually).  See paragraph 8.01(b) of the Debtor Amended Plan.  Any Class I Claim that is allowed after the first year and at any time during each of the following four (4) years will be paid a smaller amount by definition because the pro rata determination for that Claim's share will be done over a lesser period of time.  An Allowed Claim in year one (1) will benefit from each of the five (5) consecutive annual payments to the Products Liability Fund, assuming they are made.  An Allowed Claim arising in years two (2) or later will participate pro rata for a shorter period of time resulting in less total payments from the Products Liability Fund due only to the time of allowance factor.  See paragraph 9.02 of the Debtor Amended Plan.  This proposed treatment is unfair and discriminatory to the

later holders of Allowed Class I Claims.

18.   Payment is further made uneven to these Class I members and, therefore, prejudicial and discriminatory by the fact that once the Products Liability Fund is depleted in accordance with paragraph 9.03, additional payments to some of the Class I members will be made over an additional five (5) year period on the same basis as if the Products Liability Fund had not been depleted.  See paragraph 9.03 of the Debtor Amended Plan.  The result is that the Excess Class I Allowed Claims, following depletion of the Products Liability Fund, will be paid <u>direct</u> by Debtor (assuming that money for that purpose is then available in the out years) a greater percentage on a pro rata basis than others less favorably situated due to an earlier allowance of some Claims occurring in some or all of the years during the first five (5) year period.  This treatment is likewise unfair, non-uniform and discriminatory and favors some Class I members or subclasses over others for no reason.  Thus, discriminatory treatment that is unduly prejudicial exists for delayed payment of holders of the Excess Class I Allowed Claims in the same Class to the detriment of others with Allowed Claims in the same Class, which is not permissible under Chapter 11 without a legitimate non-discriminatory reason.  None exists.  It should be noted that Debtor will <u>not</u> establish a second Products Liability Fund for this subclass, and thus, from a feasibility standpoint, there are no assurances these out years payments will ever be made.

19.   Whatever the ultimate membership (subclasses) of Class I, as properly re-drawn, is determined to be in terms of ultimate dollars of Allowed Claims, including the Bucket B future Claims, if they are properly includible with the unliquidated, contingent Bucket A Claims (yet another classification issue), all Allowed Claims in a properly drawn class or subclass should be paid or provided for from the Product Liability Fund or Funds at the same time, or at least on a basis that is fair and uniform and provides equal treatment at a later time.  The amount to be paid into the Product Liability Fund, if that payment

mechanism is used, should be expanded or adjusted to provide for such contingencies for all such Allowed Claims in Buckets A and B. Debtor also does not provide for specific insurance coverage for the Bucket B future Claims, another protective mechanism that is omitted. In this regard, Debtor has provided testimony that outside products liability coverage may not be available if Arrowhead does not commit to future coverage of the kind already provided. Debtor's operations cannot continue without the certainty of coverage for future Claims.

20.     Further, for fairness and equal treatment purposes within the same Class, the Excess Class I Allowed Claims should be paid the same percentage as each Allowed Claim receiving distribution from the Products Liability Fund before it is depleted and not on a basis that is more favorable as to amount. Certainty of payment of the same pro rata amount and the method of payment should not depend on (a) the date of allowance of a Claim, or (b) whether or not a fund has been first depleted and should be uniform and even among the Class I members, unless there is a rationale for different treatment. None is known to exist here. Thus, this proposed disparate and discriminatory treatment in payment of Allowed Claims in the same class, even on a pro rata basis but from different asset sources and at different times, cannot be condoned by the Court because of the time frame and obvious payment differences caused by or resulting from the limited opportunity (due only to the time of Claims allowance) for participation in the one and only established Products Liability Fund. Claimants who are to be paid after the Products Liability Fund is depleted have an undue increased risk of never getting paid anything should the Debtor not remain in business or be only minimally profitable. This is not a risk some Creditors in the same Class, but not others, should have to assume. Confirmation thus must be denied for both misclassification and prejudicial disparity in time, method, and amount of payment to holders of the Allowed Claims in Class I. Discrimination between Classes and among members of the same Class must satisfy four

(4) criteria to be considered fair under 11 U.S.C. § 1129(b): (a) the discrimination must be supported by a reasonable basis; (b) the Debtor could not confirm or consummate the plan without the discrimination; (c) the discrimination is proposed in good faith and (d) the degree of the discrimination is directly related to the basis or rationale for the discrimination. In re: Ambanc LaMesa Assoc., 115 F.3d 650 (9th Cir. 1997). While ordinarily these principles apply to payments of trade Claims on a more favorable basis than payment of other types of unsecured Claims, there is no reason these principles should not have application to disparate treatment of Creditor Claims within the same Class. Aside from the issue whether or not Bunch and McMasker has been improperly classified with the contingent unliquidated claimants, there is no justification for different treatment of Claims within the same Class. The "discrimination" cannot be justified under the aforementioned four (4) criteria. Consequently, this proposed treatment must be rejected by the Court and confirmation denied for this discriminatory treatment.

**C.      Insufficient Amount Allocated for Payment of Class I Claims.**

21.      It is without doubt that the more substantial Class I Claims will not be paid in full. Debtor concedes this in its Debtor Amended Plan. The proposed treatment of Class I Allowed Claims under Article VIII of Debtor's Amended Plan is not fair and equitable because the total amount allocated by the three (3) payment mechanisms in paragraph 8.01 through 9.03 is not projected and bears no reasonable relation to the number and amount of the total estimated Allowed Claims in this Class I, the ultimate amount of the Allowed Class I Claims that can ultimately be expected, the reorganization value of Debtor at the time of the Confirmation hearing, or its future ability, based on financial projections and known risk factors, to satisfy creditor Claims.

         There is no provision for an increased amount payable in future years should the Debtor become more profitable through operations or obtain a financial "windfall", such as a tax refund, new Cash through the issuance of preferred stock**,** or new Cash from

additional new equity. There has been no explanation how payment of the $3 million Equity Contribution Amount (when and if received) is being allocated, if at all, in the payment of Class I Allowed Claims. It appears that Debtor, in return for a full release, has simply picked a number out of the air with which to satisfy in part the Allowed Claims of the Class I Creditors through the various payment mechanisms which are not bonded, escrowed, or otherwise reserved for, except for the annual promised payments to the Products Liability Fund.

There is no provision for treating or replenishing a missed payment to that Fund. There is no provision for interest on a missed payment. There is no way on the Effective Date for the estimated Claims earlier determined by the Court to be predicted as far as the ultimate Allowed Class I Claims for distribution purposes are concerned. No meaningful disclosures to Creditors in this regard have been made or attempted. The Azzara Report and the Pearl Reports have not been attached or summarized. Class I Creditors do not know, and cannot determine from the information provided, what they will receive or when they will receive it. Without this missing information, the reasonableness and good faith of the proposed treatment cannot be evaluated and determined. Nor can feasibility of the Debtor Amended Plan. Thus, the Debtor Amended Plan violates 11 U.S.C. § 1129(a)(1)(2)(3) and (11).

22. There is also no provision in the Debtor Amended Plan for any estimated Claims to be reconsidered and allowed in a greater or less amount under Section 502(j) of the Bankruptcy Code and FRBP 3008. Delays for years in the process of determining the ultimate Class I Allowed Claims for purposes of payment are inevitable. No payment mechanism exists beyond the 2 five (5) year periods, even should estimated Claims I become Allowed Claims eligible for payment after the expiration of ten (10) years. The ultimate amount of the Class I Claims could admittedly be more or less than any actuarial study numbers, especially given the unknown Component B or Bucket B Claims,

described by Debtor and its expert, Charles Pearl, as future Claims that have already occurred, but which are unknown to Debtor arising out of Pre-Confirmation use of Debtor's manufactured product, "related to products sold by the Debtor Pre-Petition", an ambiguous definition at best. The obvious question is "sold to whom"? The answer has many possibilities. Whether or not a Creditor is covered by a definition and thus, in or out of a Class, should not turn on an ambiguity. See paragraph 1.107 of the Debtor Amended Plan. Mr. Pearl was candid in his testimony about the expected accuracy of his findings as to future C aims, apart from the ambiguities created by the Debtor in its own language.

23.    Without a more exact method of determining the actual Class I Claims as opposed to the estimated Class I Claims, the amount allocated by Debtor for partial satisfaction of those Claims for a complete discharge (using both its own funds and the Net Products Liability Indemnification Proceeds from Arrowhead) is, therefore, speculative, insufficient and incapable of being determined under any standard to be fair and equitable. Claimants are only left to guess what they will receive and when if the Debtor survives long enough to make the payments. The <u>maximum</u> amount of Debtor's contribution over five (5) years to the Products Liability Fund, i.e. $3,000,000 plus the "Fully Funded Amount", as defined in the Debtor Amended Plan at paragraph 1.65, but not quantified in the aggregate, and any payment by way of the Net Products Liability Indemnification Proceeds, bear no known relation in dollar terms to the anticipated aggregate Class I Claims which may ultimately be allowed, or even estimated. These known Class I Claims of a more serious nature (i.e. Bunch, McMasker, Brock, Reneau, Hemstreet, Riddy) not to mention the future Claims which Debtor seeks to discharge, some of which, upon becoming known, may prove to be just as serious, admittedly will not be paid in full, resulting in a violation of the absolute priority rule if "cramdown" under 11 U.S.C. § 1129(b), as later discussed, is available and attempted. Thus, the fairness of the treatment

cannot possibly be determined.

24.     The fairness of this overall payment limit for this Class I without Creditors knowing the value of the Reorganized Debtor or the likely total of Claims in this Class I, is not assisted materially by Debtor offering only the Fully Funded Amount (not reserved or escrowed for) and the Net Products Liability Indemnification Proceeds (which could be used fully in defense costs and not paid out to Creditors) for each Class I Allowed Claim. These amounts are indeed only minimal or token for satisfaction of the larger more serious personal injury Allowed Claims, previously identified, and do not provide claimants in this Class I a fair return on their Claims in exchange for a full release. Proponents, therefore, believe that these Creditors will have a greater return on their Claims in Chapter 7 following liquidation or under the Proponents'Alternative Plan. In short, Debtor is escaping a massive amount of potential liability for minimal payments that, even if made, which is very uncertain in the out years without a replenished Products Liability Fund or escrow fund for payment of the Fully Funded Amounts, violate (a) the due process rights of each Class I member to be treated fairly with all others, (b) the absolute priority rule should use of Section 1129(b) of the Bankruptcy Code be attempted, and (c) the best interest of creditors test set forth in Section 1129(a)(7)of the Bankruptcy Code.

**D.     The Products Liability Fund is not a Separate Sueable Entity.**

**25.**    Under the Debtor Amended Plan, "Products Liability Fund" is defined at paragraph 1.90 of the Debtor Amended Plan, but in and of itself does not appear to be a separate sueable entity should payment not be made by that Fund to the Class I Creditors. The location of the Products Liability Fund and the type of account to be used for payment are not disclosed. It is not disclosed whether the account will be maintained at a FDIC insured institution. Thus, the Debtor Amended Plan does not provide for a mechanism, basic information, or for holders of Allowed Class I Claims to force payment in the event that

the Products Liability Fund is never completely funded; any promised payment due is only funded in part; or, for whatever reason, the administrator of the Products Liability Fund simply, arbitrarily and without justification, chooses not to make a valid Creditor payment due from that Fund. Failure to provide such protective mechanism or safeguard is unduly prejudicial to the holders of Allowed Class I Claims and causes the Debtor Amended Plan not to be confirmable for lack of good faith.

E.      **No Mechanism Exists for Enforcing the Covenant of the Reorganized Debtor to Make Payments to Class I Allowed Claims Holders.**

26.     Similarly, there exists no payment mechanism for enforcing the promise of the Reorganized Debtor as agent or administrator of the Products Liability Fund to make the payments to holders of Allowed Class I Claims. Paragraph 5.4 of the Debtor Amended Plan is silent on this point. Such omission is not acceptable and does not provide fair treatment to Creditors. Also, the "Fully Funded Amounts" are not escrowed or reserved for or the subject of a letter of credit or other guarantee of payment. It would appear that the Reorganized Debtor must make these contractual payments from remaining assets or from future earnings after the Effective Date. Debtor's pro formas cast doubt on Debtor's ability to do just that. For failure to provide for a payment mechanism for enforcing any contractual obligation of the Reorganized Debtor to the Class I members and thereby protect their interests and for lack of feasibility, the Debtor Amended Plan must fail of confirmation.

F.      **The Effect of the Channeling Injunction on the Ability to Force Payments from the Products Liability Fund or the Reorganized Debtor is Unclear and Ambiguous.**

27.     The Reorganized Debtor at paragraph 5.04 is the Disbursing Agent for purposes of making payments and distributions from the Products Liability Fund. However, the Channeling Injunction at paragraph 9.05 prohibits any kind of action against the Reorganized Debtor once the Channeling Injunction is issued, probably by the United

States District Court.  Thus, an inherently ambiguous Plan provision exists resulting in a terminology conflict harmful to Creditors.  If members of Class I cannot sue the Disbursing Agent of the Reorganized Debtor who owes the money to the Class I Creditors, due to the injunctive provisions, there is no Creditor remedy.  The Debtor Amended Plan lacks a mechanism for forcing payments involuntarily if there is a default, under the Debtor Amended Plan.  Thus, confirmation must be denied for the absence of any reasonable enforcement mechanism for Creditors in all Classes following Confirmation.

**G.**   **The Definition of "Unliquidated Personal Injury Claimants" at Paragraph 1.107 of the Debtor Amended Plan is Ambiguous.**

28.   The definition of "Unliquidated Personal Injury Claimants" at paragraph 1.107 of the Debtor Amended Plan:

> means Persons, including, without limitation, Persons who are currently unknown to Debtor, who have or in the future may have personal injury claims or claims for indemnity or contribution against the Debtor arising out of personal injury claims that have not been liquidated that arise out of or are related to an accident, incident or occurrence that occurred before the Confirmation Date, and are related to products sold by the Debtor Pre-Petition.

29.   For a number of reasons, this definition is ambiguous and unworkable, not the least of which is whether or not Component C future Claims previously ruled by the Court not to be proper in any Plan, are included therein.  Such impermissible Claims could be included in this broad definition.  If included, such later allowances would dilute legitimate Allowed Class I Claims to the prejudice of the holders.  Also, this definition is ambiguous because the timing as to when a product is "sold" and to whom, and when a Claim arises causes it to be either within or outside of the above definition and, therefore, either subject to or outside the Debtor Amended Plan and the Channeling Injunction. The very discharge of a Claim depends upon the meaning of this definition.  The existence of this clearly ambiguous language causes the Debtor Amended Plan to be

fatally flawed for confirmation and unworkable because Class I, as drawn, is not adequately defined as to identity and membership, and thus is not provided for in good faith as a matter of law. As an example, the phrase "related to products sold by the Debtor Pre-Petition" at the end of this definition raises numerous questions. One obvious question is "sold to whom?" It should and does make a substantial difference whether the "products" sold by the Debtor are to a consumer or to a distributor/dealer. Product that is on the dealer's shelf and not resold to the public should and must, in the event of later injury from that product, be treated differently for classification purposes than product sold direct by Debtor to a consumer or sold direct by the Debtor to a distributor or dealer who then immediately resells the product to a consumer. These inherent ambiguities in this "definition" resulting in misleading, confusion, and uncertainty as to how a Claim will be treated and discharged cause the Debtor Amended Plan to be unconfirmable.

**H.      Due Process Notice of the Claims Treatment has not been Provided to the Purported Members of Class I and is, therefore, Constitutionally Insufficient.**

30.      The Debtor Amended Plan provides no mechanism for giving actual notice to all possible members of Class I, whether Bucket A Claimants or Bucket B potential future Claimants. The Debtor Amended Plan provides no mechanism or opportunity for publication or posting of notice; no method for requiring actual notice to be sent to each of Debtor's dealers and distributors throughout the United States and elsewhere; no known notice in any trade publications or journals of general circulation for the pool/spa industry; and, no notice for Claims to be inserted, even in Debtor's catalogues for marketing of its product or on Debtor's website. Absent these reasonable and obvious methods of giving additional notice to the purported holders of Claims in this Class I, the rights and Claims of these purported Class I members cannot be cut off and the liability of Debtor discharged by means of a confirmation order or a channeling injunction. Debtor simply has not met minimum due process notice requirements for identifying and noticing all

16

possible Claimants.  Thus, the Debtor Amended Plan cannot be confirmed for failure to satisfy the numerous established methods of giving due process notice in cases of this type and complexity and violates 11 U.S.C. § 1129(a)(1)(2)(3).

**I.      Non-Disclosure of New Equity Investors.**

31.      Debtor has not identified in the body of the Debtor Amended Plan the New Equity Investors in violation of 11 U. S. C. § 1129(a)(3)(5).  Supplemental disclosures in the Amended Disclosure Statement do not cure this omission in light of the mandatory disclosure requirements of § 1129(a)(5) and the need for this critical information to be part of the actual Debtor Amended Plan.  Such non-disclosure causes the classification for the new equity interests to be defective for non-description and non-identification of obvious Insiders.  Information on future management and their positions and compensation is likewise insufficient.  Confirmation must be denied for this additional reason.

**J.      Violation of Best Interest of Creditors Test.**

32.      The Debtor Amended Plan violates 11 U.S.C. § 1129(a)(7) in that each holder of a Claim will not receive as much under the Debtor Amended Plan as it would receive in a Chapter 7 liquidation, even with Trustee expenses, if Debtor or its Trustee in Chapter 7 aggressively pursues litigation opportunities disclosed fully in the Proponents' Alternative Plan.  This violation of the "best interest of creditors test" is fatal to confirmation, since non-compliance with 11 U.S.C. § 1129(a)(7) eliminates the use of §1129(b).  The Proponents will demonstrate to the Court that each holder of an Allowed Claim will receive more either in Chapter 7 or under the Alternative Plan filed by them in this Case.  The Liquidation Analysis and Lists of Possible Causes of Action available to Debtor's Estate incorporated herein by reference from the Proponents' Alternative Plan Disclosure Statement, support Debtor's violation of this Confirmation requirement, rendering the Debtor Amended Plan unconfirmable.  In Chapter 7, these Claims and

Causes of Action would not be assigned to Bunch and will be prosecuted by the Chapter 7 Trustee or, if inconsequential, abandoned to Debtor.

**K.**    **Non-Acceptance of One Impaired Class.**

33.    It is anticipated by the Proponents that no impaired Class of Claims, excluding Insiders, will accept the Debtor Amended Plan by the requisite vote.  Therefore, it cannot be confirmed in that instance due to non-compliance with 11 U.S.C. § 1129(a)(10).  For the likely failure to satisfy all the requirements for confirmation of Section 1129(a), except compliance with Section 1129(a)(8), Debtor cannot as a matter of law use Section 1129(b) to confirm its Debtor Amended Plan.

**L.**    **Lack of Feasibility.**

34.    With respect to the feasibility of a plan of reorganization, the standard is set forth at 11 U.S.C. § 1129(a)(11).  To be feasible, a Chapter 11 plan must offer a reasonable prospect for success and be workable, although success need not be guaranteed.  In re: Danny Thomas Properties III Limited Partnership, 231 B.R. 298 (Bankr. E.D. Ark. 1999; In re: E. I. Parks No. 1 Unlimited Partnership, (Bankr. W.D. Ark. 1990); In re: Monnier Bros., 755 F.2d 1336 (8th Cir. 1985); 5 Collier on Bankruptcy, ¶1129.02 at 1129-3033.  Due to Debtor's declining profitability, as shown by its financials and Operating Reports, in particular, its audited financials for the fiscal year ending July 31, 2003, and due to Debtor's admitted loss of market share and declining margins, confirmation of the Debtor Amended Plan is likely to be followed by its liquidation, or at a minimum, the need for further financial reorganization.  Debtor, from a review of its Operating Reports and the pro formas to its Disclosure Statement, is only marginally profitable at best without paying interest on any Secured Claim (except for CMA) and without paying sizable insurance premiums to Arrowhead.  Dealing with outside providers of financing and insurance could and will result in less favorable treatment, as to monthly payments due, and will raise the cost of operations.  Debtor has not explained in its Plan where the

18

money will come from to pay Allowed Claims in all Classes and normal operating expenses. Thus, Debtor and the Reorganized Debtor cannot satisfy 11 U.S.C. § 1129(a)(11) without, at a minimum, the further need for reorganization.

The Debtor Amended Plan at Article II treats numerous Claims as Unclassified Claims without identifying them by Claimant, date incurred, or amount. Included are Administrative Claims, Professional Fee Administrative Claims, Preserved Ordinary Course Administrative Claims, Allowed Priority Tax Claims, and quarterly fees to the United States Trustee. Debtor proposes to pay these Claims in full in Cash on the Effective Date, which, from a review of its Operating Reports and financials, will require a very substantial amount of front end Cash that Debtor either does not have, or is not projected to have. No schedule of the anticipated amounts payable to these Creditors or the anticipated Cash on hand on the Effective Date for payment is attached to the Debtor Amended Plan or Amended Disclosure Statement.

35.    As an example, Debtor proposes that Arrowhead Insurance Company ("Arrowhead") be paid as an Administrative Claim all Post-Petition accrued but unpaid insurance premiums due this insider captive insurer of Debtor. The amount from the attachment to the Supplement to Debtor's Disclosure Statement reveals potential Arrowhead Administrative Claims for Post-Petition premiums of approximately $4,505,900.00 and $169,202.86. This information is or may be inconsistent with that provided by Debtor in support of an earlier attempted global settlement outside the Debtor Amended Plan. The Class C Secured Claim of J. M. Capital is proposed to be treated on the Effective Date by paying $2,000,000 in principal and in excess of $1,830,000 in accrued interest for a total of approximately $3,830,000. Under the proposed treatment of the Class I personal injury Claims, substantial front end Cash will, under the payment formula, be needed for partial payment of the identified Allowed Claims in that Class should they, in fact, become Allowed Claims on and after the Effective Date.

36.     The amount necessary to pay in full the total projected Allowed Claims payable on or
shortly after the Effective Date could well exceed the Debtor's Cash on hand on the
Effective Date or in the first year after Confirmation, if not on the Effective Date,
depending upon which Claims actually become Allowed Claims and when.  This
information on projected Cash is within Debtor's control, but has not been shared with
Creditors.  The projected payout to Class I Claimants and Administrative Claimants
(unclassified) is not disclosed anywhere.  Creditors are left to guess at the amounts owed.
 In addition, the taxes and professional fees, not to mention the U.S. Trustee quarterly
fees, based on past experiences in this Case will easily consume additional hundreds of
thousands of dollars by and after the Effective Date.  These expenses already exceed
$1,500,000.  Thus, the total front end Cash needed, as of late 2004, or early 2005, to meet
the Cash requirements is extraordinary, but not disclosed or projected, with Cash reserves
likely not available to satisfy these Claims.  Proponents estimate that the Cash
requirements on and after the Effective Date, even assuming the deferral of Post-Petition
trade payables, are in excess of $11 million, generating a Cash deficit in excess of $3.5
million.

37.     The burden is on Debtor to demonstrate feasibility and all other requirements of Section
1129(a) before Confirmation is granted.  In re: Euerle Farms, Inc., 861 F.2d 1080 (8th Cir.
1988), and Heartland Fed. Savs. & Loan Ass'n. v. Briscoe Enters., Ltd., 994 F.2d 1160
(5th Cir. 1993).  Debtor is not likely to have anywhere near this amount of Cash on hand
on and after the Effective Date of the Debtor Amended Plan based on its normal business
cycle and past Operating Reports filed.  Debtor has not stated that it can borrow the
necessary Cash to make the proposed distributions and continue with operations.  In fact,
Debtor has not stated whether it now has or will have any credit facility in place on the
Effective Date of sufficient size to fund operations apart from the Debtor Amended Plan
required payments.  It has been held that a bankruptcy court has an independent duty to

determine whether the proposed Chapter 11 Plan complies with the statutory confirmation requirements. M J Metal Products, Inc., 292 BR 702 (D. Wyo. 2003). Thus, for all the above reasons, the Debtor Amended Plan is unconfirmable for lack of feasibility according to its terms, and is in violation of applicable law, especially Section 1129(a)(11). Proponents do not believe that, as required by 11 U.S.C. § 1129(a)(11), Debtor can show concrete evidence of a sufficient Cash flow to fund and maintain both its operations and obligations under the Plan. S & P, Inc. v. Pfeifer, 189 B.R. 183 (N.D. Ind. 1995).

38.    Further, the projected statements of Cash flow activity for the years 2005, 2006, and 2007, do not indicate to a reasonable certainty sufficient income with which to fund the Debtor Amended Plan in future years. As the Proponents understand it, there is no supplemental funding mechanism or reserve beyond that set forth in the Debtor Amended Plan to meet Cash shortfalls in Plan payments and unforeseen contingencies in Debtor's operations. Absent such safeguards, the Debtor Amended Plan appears to be unfeasible on its face.

39.    Also, Debtor has not disclosed to a reasonable certainty its ability to obtain continuing insurance coverage at market rates should Arrowhead decline to provide future coverage, or not be able to meet applicable reserve requirements under laws applicable to it to continue in business. Nor has Debtor disclosed the existence of another available operating line of credit should CMA Corporation decline to extend further credit to Debtor. Documents introduced by Debtor in August, 2004, during a contested hearing on Debtor's attempted global settlement with related parties suggested grave doubts about the continuation of both past the end of September. Absent assurances to a reasonable certainty that these sources of insurance and funding critical aspects of Debtor's operations in the future exist, the Debtor Amended Plan is unconfirmable for lack of feasibility and violates § 1129(a)(11).

21

**M.   Non-Continuance of Retiree Benefits.**

40.   The Debtor Amended Plan does not provide for the continuation after the Effective Date of all retiree benefits as defined in Section 1114, at the level established pursuant to other provisions of Section 1114.  The Debtor Amended Plan, therefore, violates 11 U.S.C. § 1129(a)(13).

### III.  OBJECTION TO APPROVAL OF EQUITY CONTRIBUTION AMOUNT

41.   As required by Debtor in paragraph 7.02 of the Debtor Amended Plan, the Proponents object to the amount of the Equity Contribution Amount for the following reasons:  (a) there is no reason or basis given as to how said amount was calculated and what it will be used for to assist Debtor's reorganization; (b) Debtor has not referred to any expert valuation report as a basis for the determination of the fairness of the Equity Contribution Amount in the Reorganized Debtor; (c) Debtor has not stated how this Equity Contribution Amount is necessary to the reorganization of the Reorganized Debtor; and, (d) the exact amount of the Equity Contribution Amount appears to be based on contingent events beyond the control of this Court and Creditors, is not presently determinable to a reasonable certainty, bears no reasonable relation to the present fair market value of the equity position of the Reorganized Debtor as demonstrated by the Alternative Plan, and is not being paid all in Cash on the Effective Date.

42.   The value of the $2,500,000 Purchase Note cannot be determined with any degree of reasonable certainty.  The definition of this term, i.e. "Equity Contribution Amount" at paragraph 1.56 of the Debtor Amended Plan "means the total amount of $3,000,000 that the New Equity Investors will pay to the Reorganized Debtor in exchange for the New Common Stock which shall be paid in the form of $500,000 in cash or cash equivalent and the Purchase Note."  The term "cash equivalent" is not defined, and the makers of the Purchase Note are likewise not identified in the Debtor Amended Plan.  Creditors are left to speculate about such matters.  Debtor, in the Attachments to its Amended Disclosure

Statement, does identify by indirect reference the "makers" of the Purchase Note.  See page 2, paragraph 6 of Debtor's Supplement to its July 19, 2004, Disclosure Statement.  But this is not a sufficient disclosure under the circumstances, and no financial information is provided on the "makers", especially a glaring omission when the makers are Insiders or related parties who will continue in control of the Reorganized Debtor and constitute its management.  Creditors should not have to consult multiple documents which are lengthy and confusing to find out who the "makers" are and what role they will have.

43.   The definition of "Purchase Note" at paragraph 1.98 simply refers to a "promissory note in the amount $2,500,000, in a form satisfactory to the Reorganized Debtor, the payment of which shall be contingent upon the outcome of the Bunch Preference Case."  A specimen Purchase Note is not attached.  The only information on the "due date" is misleading as compared to the information on that same subject contained in the Supplement to the Debtor's Amended Disclosure Statement.  The language at paragraph 7.01 and at paragraph 6 of Debtor's Supplement is somewhat different and misleads Creditors.  Any typo in the language accounting for the ambiguity should be corrected in a formal amendment.  While the outcome of the Bunch Avoidance Action favorable to Debtor is now known at the trial level, subject to the Bunch/McMasker direct appeal and Debtor cross-appeal to the U.S. District Court, the essential terms of the "Purchase Note" are not known and disclosed anywhere.  For instance, the disclosure of the interest rate, if any, is non-existent as is any collateral for this Purchase Note.  Also, the financial condition of the "makers" is not disclosed.  There is no disclosure whether the makers will have joint and several liability or only several liability.

44.   Therefore, such critical missing information causes the "Purchase Note" to be illusory and a suspect asset.  Thus, the feasibility of the Debtor Amended Plan is called into question for failure to identify all components of the Equity Contribution Amount and

assure their contribution in money or money's worth into the Reorganized Debtor.  Too many conditions exist to make the full amount or the lesser amount a realizable present Cash or cash equivalent contribution in terms of real U.S. Dollars.  <u>Norwest Bank of Worthington v. Ahlers</u>, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed. 20, 169 (1988).  And, if the Purchase Note never becomes effective, the fairness of the New Equity Contribution becomes even more suspect and less certain, as does feasibility.

**N.**     **Undue Discriminatory Provisions in Favor of Insiders and Affiliates, Impacting Good Faith.**

45.     The Debtor Amended Plan unduly discriminates in a number of places in favor of Insiders and Affiliates to the prejudice of outside Creditors.  Debtor, as the proponent, is under a duty to be fair and not breach the fiduciary duty owed Creditors in proposing a plan of reorganization for payment of Claims.  Insiders should not be preferred at the expense of outside Creditors.  The best example of this discriminatory and unfair treatment is the proposed treatment and preferential payment of the Claim of insider/affiliate J.M. Capital Finance Company, Ltd. ("J.M. Capital") as a Class C Secured Creditor before it has been allowed by this Court and before it is due, according to the debt instrument.  Bunch and McMasker have filed a Complaint for Reconsideration of Claim for Cause, Reclassification of Claims and Avoidance of Liens or, in the Alternative, for Equitable Subordination of Claims and Liens filed August 6, 2004.  The J.M. Capital Motion to Dismiss was denied by the Court on September 30.  If that litigation is successful, the purported J.M. Capital Secured Claim, which has not yet been allowed by any Final Order dealing specifically with that subject, could be reclassified as equity or subordinated under 11 U.S.C. § 510 to the Claims of all legitimate Creditors of Debtor and any liens avoided.  Thus, the potential exists for a liability in excess of $12.1 to $12.5 million (depending upon the exact interest accruals) being removed from Debtor's balance sheet.

46.   The Debtor Amended Plan cannot be confirmed by Final Order under any circumstances until the Bunch and McMasker Adversary Complaint has been finally adjudicated in this pending litigation.  In fact, to expedite the plan Confirmation process for both pending plans, the Bunch and McMasker Complaint in that litigation should be consolidated with and tried in November as part of the Confirmation hearing on the Debtor Amended Plan.  The Debtor Amended Plan contemplates that objections to Claims can be filed 180 days after the Effective Date, unless extended by the Court for good cause shown.  See paragraph 1.30 of the Debtor Amended Plan.  Thus, until the J.M. Capital Claim is allowed or disallowed as a result of a Final Order in the adversary proceeding or after the expiration of the 180 day period for objections, no Confirmation order, other than possibly a conditional order, can be entered.  Depending on the outcome of that litigation, the Debtor Amended Plan may have to be amended or withdrawn.  Confirmation of the Debtor Amended Plan and the Alternative Plan may, therefore, be premature, except on a conditional basis, until the pending adversary proceeding is resolved.

47.   Aside, however, from said pending litigation brought by Bunch and McMasker, which questions the status of the J.M. Capital Secured Claim and the Arrowhead Administrative/Priority Claim, Debtor impermissibly in its Debtor Amended Plan restructures this loan from an Insider or related party to favor it materially at the expense of the legitimate Creditors.  The Debtor Amended Plan provides without explanation for an up front $2,000,000 principal payment, plus an interest payment in excess of $1.5 million on said Claim.  Debtor ignores the Note due date of August, 2009, by inexplicably accelerating a portion of the principal payment when such is not required or necessary.  The Debtor Amended Plan provides no method for valuation of the collateral for this purported Secured Creditor that is a statutory Insider, and fails to advise Creditors that this purported loan, even if valid, is, by its terms, an interest-only loan until year 2009.  An early payment of significant principal equal to $2,000,000 deprives the Debtor

of needed working capital and lessens its ability to reorganize.  Thus, not only are the disclosures inadequate for this Insider/Affiliate loan, preferential unfair treatment (not warranted or required by the loan documents) is provided for both repayment and collateral reaffirmation to the extreme prejudice of both the outside Creditors and Debtor.  The "good faith" requirements of 11 U.S.C. § 1129(a)(3) have note been met in this regard.

48.     Further, in light of recent testimony and document disclosure to the contrary as to the extent of the full funding of this alleged loan by J.M. Capital, Debtor continues to take the position in a possible breach of fiduciary duty to Creditors, despite detailed factual assertions to the contrary contained in the Bunch/McMasker Complaint, that this is an arms-length, fully Secured loan, properly and fairly negotiated, and owed to the fullest extent in excess of $12,000,000.  This Court, under applicable case law, and due to the value of the J.M. Capital collateral position, is under an independent duty to determine, review, and reconsider the nature, extent, priority, and validity of the J.M. Capital insider loan and all collateral positions attendant thereto, including certain Post-Petition lien positions earlier granted by this Court at a time when full disclosure of the transaction to Creditors was not made.  The discriminatory treatment of this Insider/Affiliate Secured Claim also violates the good faith provisions of § 1129 (a)(3) of the Bankruptcy Code regarding the proposal of plans that unduly discriminate in favor of insiders.  Thus, confirmation must be denied for this additional reason.

**O.      Treatment of the Arrowhead Administrative Claim is Likewise Discriminatory.**

49.     As mentioned above, Debtor apparently intends to treat and pay in full the purported Administrative Claims of Arrowhead Insurance Company in the amounts of $4,505,900.00 and $169,202.86 or other amounts without (a) considering any setoffs or premium returns that are applicable; (b) prior to the conclusion of the pending adversary proceeding; and, (c) without any Final Order being entered allowing the Arrowhead

Claim in any amount, ignoring Proponents' objection to and questioning of the Arrowhead Claim. Debtor apparently has not had the validity of its own Claims against Arrowhead reviewed by outside counsel or independent consultant with no possible conflicts of interest and ties to current management. Absent that process or Final Order in the adversary proceeding, the Arrowhead Claims are not ready for payment. Nor, upon information and belief, has Debtor obtained a fairness opinion from outside independent sources to support the allowance of the Arrowhead Claims, regardless of classification. Questions exist whether these Claims are priority or administrative in nature, or even partly unsecured. Thus, the treatment of these Insider Claims is discriminatory and not proposed in good faith, thereby violating 11 U.S.C. § 1129(a)(3). The amounts are unknown and contradictory. For reasons set forth in the Don Bendure Report made an exhibit to the Alternative Plan Disclosure Statement incorporated herein by reference and under applicable preference law, substantial setoffs do or may exist to the full liability being owed.

**P.      The Channeling Injunction is Unlawful and not Supported by the Bankruptcy Code.**

50.     The proposed channeling injunction in paragraph 9.05 of the Debtor Amended Plan is unlawful because it is only allowed in asbestos cases under § 524 of the Bankruptcy Code. This being neither an asbestos case, nor for that matter a mass torts case as already determined by the Court, the concept of a channeling injunction for future Claims against Debtor is illogical, unnecessary, and contrary to law. It is prejudicial to the rights of future claimants given the breadth and scope of the proposed channeling injunction which will only spawn future litigation as to its purpose, scope, and its application when legitimate future Claims, including possible Component C Claims, that cannot be affected or terminated by the Debtor Amended Plan are prosecuted. Confirmation must be denied for the inclusion of this proposed injunction, which is improper on its face.

**Q.      The Insider/Affiliate Injunction/Release is Discriminatory and Unlawful.**

27

51.    The Debtor Amended Plan contains a proposed injunction at paragraph 16.06 that
benefits only Insiders and Affiliates.  This proposed injunction is a disguised release of
all Claims of the Debtor and all Claims of Creditors or Equity Interest Holders against a
broad variety of Insiders and Affiliates, including the Debtor, the Reorganized Debtor, or
their officers, directors, shareholders, or other persons related to the Debtor or
Reorganized Debtor.  The list of released parties is both broad and unascertainable.
Creditors cannot determine the exact parties to be released and what Claims are being
released against them for no apparent consideration.  By this proposed injunction, the
Debtor and its incumbent management seeks to accomplish what this Court has already
denied, i.e. a global settlement and release of all Claims against many of the same
insiders and affiliates of Debtor, who at one time, were willing to pay $1 million for such
release.  No similar Cash offer is contained in the Debtor Amended Plan.  At a lengthy
hearing on August 19 and 20, 2004, following substantial testimony and argument of
counsel, the Court failed to approve the proposed global settlement with related parties.
The Court made a number of findings which are equally applicable here to defeat this
injunction and deny confirmation.  The Proponents have identified in their Disclosure
Statement for the Alternative Plan numerous possible actions against Insiders, Affiliates,
and professionals of Debtor.  These will be released for no benefit to Debtor or Creditors
if the Debtor Amended Plan is confirmed.

52.    Among those potential actions that can be brought, if not time barred or earlier released,
or subject to setoff, recoupment, laches, or other defenses are the following:

A.    Section 547 of the Bankruptcy Code, Insider preference action against Insider
Arrowhead for recovery of in excess of $811,000, plus interest, costs, and
attorneys' fees based on a Pre-Petition transfer shortly before the Petition Date.

B.    Section 549 of the Bankruptcy Code Post-Petition recovery action against Insider
Arrowhead for Debtor's wrongful payment in excess of $52,000 for insurance

premiums to Arrowhead in January, 2002.

C.     Section 544 of the Bankruptcy Code and Arkansas state law fraudulent
conveyance action under ACA § 4-59-201, et seq. against J. M. Capital for
avoidance of at least $1,750,000 of a $10 million Promissory Note allegedly owed
that Creditor, and avoidance of certain Pre-Petition security interests in Debtor's
assets created and perfected in that transaction that provided no benefit to Debtor
and benefited only the shareholders of Debtor.

D.     State law recovery action against Debtor's directors for the declaration and
payment by Debtor of an illegal dividend to Debtor's then shareholders in August,
1999, in the amount of $1,750,000 arising out of the JM Capital loan transaction,
when such payment violated or may have violated the provisions of Arkansas
corporate law, i.e. 1965 Arkansas Business Corporation Act, specifically A.C.A §
§ 4-26-619 and 4-26-620.  See also ACA § 4-26-811.

E.     Action against Debtor's officers, and directors for negligently or willfully and by
a breach of fiduciary duty owed the Debtor and its creditors allowing Debtor to
pay excessive insurance premiums to Arrowhead, i.e. some significant portion of
approximately $1.6 million to $1.7 million annually, when the market rate for
better coverage was at a far lower rate.

F.     Per the Bendure Insurance Report (Bunch and McMasker retained expert), causes
of action available to Debtor against Arrowhead in the amounts described in
Section IV of the Alternative Plan Disclosure Statement.

G.     The Debtor possesses Claims against Arrowhead for breach of contract and for
the refusal to settle the Bunch matter as a violation of the covenant of good faith
and fair dealing implied in all insurance contracts.  Approximately one year prior
to the trial of the Bunch matter, the Debtor and its insurer were served with a
statutory offer to compromise the Bunch matter which was within the policy

29

limits of the Arrowhead policy.  The offer expired without acceptance.  The case went to judgment in excess of the policy limits.  After trial, Arrowhead failed to make a settlement offer at settlement conference.  Debtor was forced to declare bankruptcy due to Arrowhead's failures in this regard.  The potential damages that could be recovered under this Claim would be the amount of the Bunch Judgment, the costs of bankruptcy, and the loss of reputation of the Debtor.

H.      Reclassification of Claims, Reconsideration of Claims, Avoidance of Liens, and Subordination of Claims Action against JM Capital and Arrowhead.

I.      Action against City of West Helena, Arkansas, to compel the reconveyance of title to the Arkansas Real Property.

53.     This is not a complete list of all possible actions, only the most likely ones based on presently known and ascertainable facts without access to or a review of Debtor's books and records.  The Proponents are hindered in their investigation since they do not yet have access to Debtor's books and records, real property records, internal files, minutes, correspondence files, the statute of limitations extension agreements, and software programs.  These listed actions are in addition to those two (2) Avoidance Actions already brought by Debtor against Bunch/McMasker and C.H.I.P.S.  Proponents recognize that some or all of the Avoidance Actions and other Claims belonging to  the Estate could be barred by limitations or laches or any recovery reduced by setoff, recoupment, other defenses, or otherwise.

54.     If the Debtor Amended Plan is confirmed and the injunction at paragraph 16.06 becomes effective, all these potential claims will be released for absolutely no known consideration and for no benefit to Debtor and the Creditors, notwithstanding that these same parties were willing at one time to pay $1 million for a similar release.  The effect of the issuance of the injunction will, in part, be to make unconfirmable the Proponents' Alternative Plan since Bunch will be denied the assignment and prosecution of these

Claims and causes of action , causing her to withdraw her support of that Plan.  In effect, Debtor, to the direct injury and detriment of all outsider Creditors, and presumably without a fairness opinion from outside independent counsel or an independent consultant is, without explanation, favoring its Affiliates, Insiders, related parties, officers, directors, shareholders, and others by not only granting them releases, but stripping various causes of action away from Debtor's estate and put them beyond the reach of Bunch and the other Creditors.  It appears that the Bunch Claim against non-debtors in California would also be released for no benefit to Bunch, an event that this Court has already found unacceptable.

55.   For lack of consideration, for breach of fiduciary duty, and for violation of the applicable provisions of the Arkansas Corporation Code and Arkansas case law governing the conduct of Debtor in its dealings with its Creditors, the proposed injunction should not be permitted and confirmation should be denied for lack of good faith treatment of Creditors in violation of 11 U.S.C. § 1129(a)(3) and for all the above additional reasons.

56.   The effect of a confirmed Chapter 11 Plan of Reorganization is spelled out in great detail in 11 U.S.C. § 1141.  Further injunctive relief of the kind included in paragraph 16.06, aside from its discriminatory and prejudicial effect on Creditors, is not warranted under any circumstances, is both unnecessary, and inappropriate.  In summary, the language of the injunction is too broad and ambiguous, its purpose is not disclosed, and the parties to be released are not sufficiently identified.  Further, there has been no showing by Debtor or the persons and entities to be released as to what claims are, in fact, being released and what exposure, if any, the released parties may have to Debtor if the claims are not released.  The effect of these substantial non-disclosures alone causes the injunction not to be proposed in good faith and additionally violates 11 U.S.C. § 1129(a)(2)(3).  Thus, confirmation should be denied.

R.   **The Preference Claim Release Provisions for Class J Are Discriminatory.**

31

57.     Debtor proposes in paragraph 16.05 to release certain preference claims against the Class
        J Unsecured Creditors without any explanation or reason why this is being proposed.
        Class J is defined at Article III, paragraph (c)(3) as "All Claims against the Debtor not
        specifically classified otherwise, including, but not limited to general unsecured Claims
        against the Debtor based on rejection of leases, rejection of executory contracts, trade
        credit, or judgments not related to personal injury.  Class J also purportedly includes the
        unsecured portion of the Claims, other than the Bunch Claim, which are reduced pursuant
        to section VIII of this Plan.  The amount and collectability of any possible preference
        Claims against Class J members are not disclosed.  Therefore, the Court and Creditors
        have no way of determining the magnitude (both number and amount) of the released
        preference Claims against these Class J members, in and of itself, an ambiguous and
        inartfully crafted class.  This proposed treatment discriminates against Bunch, who will
        not have the preference claim against her released.  The treatment of her Claim, even in a
        separate class, as opposed to the treatment of others who also are Unsecured Creditors is,
        therefore, unduly discriminatory and unwarranted.  Creditors are not told of the amount
        and validity of the total preference Claims released, how that will affect their distribution,
        and what the estate is losing if this provision should be included as part of the confirmed
        Debtor Amended Plan.  For instance and as an example, Debtor has not contended that a
        release of preference Claims against trade creditors or suppliers is necessary for the
        continuation of business with those entities.  No consideration for these releases exists.
        Confirmation should be denied for including this preference Claim release.

### IV.  OBJECTION TO DEBTOR'S USE OF § 1129(b)

58.     Under § 1129(b) of the Bankruptcy Code, a bankruptcy court can confirm a Chapter 11
        plan, notwithstanding a lack of acceptance of all impaired Classes, through a
        "cramdown".  In a Chapter 11 cramdown, the treatment afforded the Class of Creditors or
        equity security holders being cramdowned must be "fair and equitable".  11 U.S.C. §

32

1129(b)(1); In re: Perez, 30 F.3d. 1209 (9th Cir. 1994). The application of the phrase "fair and equitable" as to a descenting class of impaired Unsecured Creditors is known as the "absolute priority rule", which generally provides that the holder of any junior Claim or interest may not receive or retain any property under a Chapter 11 plan on account of such junior or interest, unless all senior Classes of Creditors give a consent to the Plan or are paid in full. 11 U.S.C. § 1129(b)(2); In re: Perez, supra; In re: Boston and Marine Corp., 719 F.2d 493 (1st Cir. 1983);and, In re: Tuscon Self-Storage, Inc., 166 B.R. 892(BAP 9th Cir. 1994).

59.    Proponents anticipate that Debtor will elect to "cramdown" the Debtor Amended Plan because, at a minimum, it will not be able to satisfy all the requirements of 11 U.S.C. § 1129(a). For certain, due to the Bunch and McMasker ballot rejection of the Debtor Amended Plan, even should they remain in impaired Class I over their objection, Debtor cannot satisfy § 1129(a)(8) of the Code since at least that Class, as presently drawn, will not accept the Debtor Amended Plan by the requisite vote. Due to the size of their Claims, Bunch and McMasker control the vote in Class I, even with the inclusion of the impermissible members. Satisfying all the other requirements of § 1129(a) of the Code will be difficult, as well. Thus, Debtor will have to resort to "cramdown" under 11 U.S.C. § 1129(b) to obtain Confirmation.

60.    It is anticipated that Debtor has attempted or will attempt, by use of the "new value" exception, to get around or circumvent the "absolute priority rule" which mandates that no junior Class can receive or retain any property on account of its prior status, unless all senior Classes are paid in full with interest. 11 U.S.C. § 1129(b)(2)(B). The Debtor Amended Plan, notwithstanding that the equity interest of the original shareholders will be cancelled, purports to vest the newly-issued common stock in the Reorganized Debtor in the New Equity Investors who are not identified in the Debtor Amended Plan, but who, from a supplemental disclosure, are essentially the same shareholders as the old equity

investors. Failure to identify the New Equity Investors in the Debtor Amended Plan creates a presumption that they are one and the same, or that any difference in these shareholders is so minimal as to be disregarded. Debtor gives no explanation why the New Equity Investors are not identified in the body of the Debtor Amended Plan. Supplemental disclosures made in Debtor's Amended Disclosure Statement confirm the correctness of this, but do not cure the obvious non-disclosure problem. See page 1, paragraph 3, of the Debtor's Supplement to Its July 19, 2004, Disclosure Statement. This Court should, therefore, find and determine that the New Equity Investors are, in all respects, the same as the original equity investors whose shares are being cancelled and, that the New Equity Investors are, in fact, retaining property under the Debtor Amended Plan on account of such prior interests.

61. A technique recognized by some courts to avoid application of the "absolute priority rule" is a "New Equity Contribution" or "New Value Exception" used here by Debtor as the proponent. "The New Value Exception" is generally regarded as originating in <u>Case v. Los Angeles Lumber Company</u>, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). The U. S. Supreme Court in <u>Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership</u> ("North LaSalle"), avoided deciding whether or not the "New Value Exception" survived the enactment of the 1978 Bankruptcy Reform Act. It held, however, assuming a new value corollary to the absolute priority rule exists and survived such enactment, Chapter 11 plans providing junior interest holders with exclusive opportunities, free from competition and without benefit of market valuation, fall within the prohibition of the absolute priority rule. The Proponents deny that the "Equity Contribution Amount" identified at paragraph 1.56 of the Debtor Amended Plan is sufficient in amount and has been calculated properly to avoid application of the absolute priority rule, even if this so-called "New Value Exception" survived the enactment of the 1978 Bankruptcy Reform Act.

62.     Courts that have applied the "New Value Exception" have stated that the Debtor's "existing equity" may retain its ownership interest in the debtor if it contributes "new value" to the debtor, which contribution must satisfy at least five (5) different tests or standards: (a) new; (b) necessary for a successful reorganization; (c) substantial; (d) reasonably equivalent to the interests being received; and (e) in the form of "money or money's worth". It is clear from the case law that "sweat equity" or "future services" will not qualify as "money or money's worth". See Ahlers, *supra*; Coltex Loop Central 3 Partners, L.P. v. BT/SAT Pool C Associates, L.P., 138 F.3d 39 (2nd Cir. 1998); In re: Ambanc, *supra*; In Re Bonner Mall Partnership, 2 F.3d 899, 908 (9th Cir. 1993 cert. granted), 114 S.Ct. 681 (1994); In re: U.S. Truck Co., 800 F.2d 581, 885 (6th Cir. 1986); In re: Woodbrook Assocs. 19 F.3d 312, 320 (7th Cir. 1994).

63.     The Debtor Amended Plan defines "Equity Contribution Amount" as follows:

>       1.56 "Equity Contribution Amount" mean the total amount of $3,000,000 that the New Equity Investors will pay to the Reorganized Debtor in exchange for the New Common Stock which shall be paid in the form of $500,000 in cash or cash equivalent and the Purchase Note.

The Debtor Amended Plan defines "New Equity Investors" as follows:

>       1.76 "New Equity Investors" shall mean the Person(s) comprised of some or all of the current shareholders or an entity owned by all or a part of the current shareholders, who contribute the New Equity Contribution in exchange for the New Common Stock.

Although not identified in the Debtor Amended Plan, paragraphs 2 and 3 of Debtor's Supplement to its July 1, 2004 Disclosure Statement identify the "New Equity Investors" as the current stockholders of the Debtor, thus the New Equity Investors are, in fact, the same as the old stockholders. This is significant and relevant for purposes of application of the absolute priority rule.

The Debtor Amended Plan defines "Purchase Note" as follows:

>       1.98 "Purchase Note" shall mean a promissory note in the amount of $2,500,000, in a form satisfactory to the Reorganized Debtor, the

> payment of which shall be contingent upon the outcome of the
> Bunch Preference Case.

Paragraph 6 of the Debtor's Supplement to its July 19, 2004 Disclosure Statement

is as follows:

> 6.  The makers of the Purchase Note referred to in the First Amended Plan
> of Reorganization will be the same as the individuals identified above
> as the current shareholders of Hoffinger Industries.  The due date of
> the purchase not will be the later of the Effective Date of the First
> Amended Plan of Reorganization and twenty (20) days after the entry
> of a Final Order in the Bunch Preference Case in favor of Hoffinger
> Industries.

64.   The insufficiency of this Equity Contribution Amount to avoid application of the absolute

priority rule is documented in part by the amounts which Cornelius will pay for some of

the assets of Debtor under the Proponents' Alternative Plan.  These amounts include

$7,500,000 Cash in U.S. Dollars (USD); up to $4,500,000 (USD) in assumption of

Debtor's Post-Petition trade payables on the Effective Date; the honoring of product

warranty claims; and, litigation financial support up to the sum of $100,000 for the

benefit of Creditors in the adversary proceeding brought by Bunch and McMasker

against J.M. Capital and Arrowhead.  These sums are in actual Cash or real Cash

equivalents, and unlike Debtor's proposed "Equity Contribution Amount," as defined in

the Debtor Amended Plan, are not illusory, contingent, or uncertain based on future

events.  These Cornelius contribution amounts, unlike the above "Equity Contribution

Amount" to be infused into Debtor by its old Equity Interests, were arrived at after

careful deliberation and consultation by Cornelius with its investors, investment bankers,

and insurers, as well as the *lender* entities willing to extend it credit for the asset

acquisition.  In contrast, Debtor's proposed "Equity Contribution Amount" from the New

Equity Investors bears no reasonable relation to the reorganization value of Debtor, is not

identified by an expert whose report is available to Creditors, is supported by no known

appraisal or expert report, is insufficient in amount, is conditional and contingent in

nature, is speculative as to present value, and appears to be simply a number pulled out of "thin air". Payment of that "new value" to avoid application of the absolute priority rule is not immediate; could and will be delayed for months, if not years until the Bunch Avoidance Action is finally concluded; no escrow, letter of credit, or reserve has been established; the net worth of the purported makers of the Purchase Note has not been disclosed; and, it has not been demonstrated by Debtor how that modest sum, in relation to the total debts owed and what Cornelius is willing to pay for some of the Debtor's assets, will assist in or is necessary to its reorganization.

65.     The new equity contribution must be a present contribution, taking place on the Effective Date of the plan rather than a future contribution. In re: Ambanc, *supra*; and In re: Yasparro, 100 B.R. 91, 96-97 (Bankr. M.D. Fla. 1989) holding that promissory notes from the individual debtor to the unsecured Creditors were future, rather than present contribution, and thus did not satisfy the new value corollary. See also In re: Stegall, 85 B.R. 510 (C.D. Ill. 1987), affirmed 865 F.2d 140 (7th Cir. 1989). Said sum (assuming the entire $3 million is actually available and paid) is woefully insufficient to pay in full the Claims of Creditors and simultaneously allow Debtor's existing shareholders, or those affiliated with Debtor's existing shareholders, to retain control of the company, continue to draw either salary, dividends, expense reimbursements, or medical benefits, and at the same time escape personal liability to Bunch and others should the paragraph 16.06 Injunction in the Debtor Amended Plan be granted.

66.     The Debtor Amended Plan also is discriminatory, not fair and equitable, not proposed in good faith, and is not in the best interest of Creditors because it does not allow competitive bidding for Debtor's equity position. This privilege is impermissibly reserved solely to the existing shareholders of Debtor who will also be the New Equity Investors under the Debtor Amended Plan. Outside Creditors or competitors of Debtor who might want to acquire Debtor or its assets at an auction are without any means to do

so under the Debtor Amended Plan. There is no provision, apart from a public auction, for Creditors to credit bid their Claims for the Debtor's equity position. Thus, it can never be determined by and through competitive bidding, by process open to the public and the Creditors, the present reorganization value of this Debtor. This feature of the Debtor Amended Plan is unduly discriminatory, ~~and~~ violates the "fair and equitable" test under § 1129(b), and violates North LaSalle and subsequent cases.

67.    The Debtor Amended Plan is silent as to any means of advertising for bids for or the equity position on the Reorganized Debtor, a circumstance that, under applicable case law and the Bankruptcy Code, dooms the Debtor Amended Plan to non-confirmation and hinders Creditors in the determination of a fair price for this Reorganized Debtor. The U.S. Supreme Court in North LaSalle, was dismissive of the policy arguments that supposedly favored the exclusivity aspect of "new value" plans:

> If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor.

Although the Court implied that the old equity holders might be able to purchase equity in the reorganized entity in a market-based auction, the Court stopped short of outlining the procedures that courts should follow in market-testing the purchase of new equity in Chapter 11:

> Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here. It is enough to say, assuming a new value corollary that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of [the absolute priority rule].

68.    The fact that "exclusivity" has now been terminated in this Case does not or may not

without more guarantee the equity position of Debtor will be properly valued through competing plans or otherwise.  While the Alternative Plan submitted by the Proponents is a competing plan, the equity interest, as such, is not being marketed, only some of the assets.  Also, since the Debtor Amended Plan will be heard first, there may not be an opportunity to review and measure the Cornelius bid if the Debtor Amended Plan is confirmed.  Only competitive bidding by public auction for the equity position in connection with the consummation of the Debtor Amended Plan will satisfy the requirements of the U.S. Supreme Court and lower courts that the equity position be fully valued and tested in the open market in the best interest of Creditors.  See also In Djolmes Realty Trust, 134 BR 1000 (Bankr. D. Mass. 1991) (pre-North LaSalle); In Re: Ropt, Ltd. Partnership, 152 BR 406 (Bankr. D. Mass. 1993) (pre-North LaSalle); and, In Re: M J Metal Products, Inc., 292 BR 702 (D.Wyo. 2003).  (If a "new value" contribution exists as an exception to the absolute priority rule, exposure to the market is essential to obtain that new value following North LaSalle.

69.    Debtor, as the proponent of the Debtor Amended Plan, through its management and shareholders, could have avoided the application of the absolute priority rule in a number of ways.  Instead of fighting efforts of Creditors to terminate exclusivity years earlier, Debtor could have waived exclusivity which would have earlier provided Creditors an opportunity to file a competing plan.  Debtor could have provided in the Debtor Amended Plan with a process for competitive bidding for its Equity Interest by (a) public bidding at an auction following advertising; (b) sealed bids; (c) credit bid by Secured or Unsecured Creditors; or (d) any combination of the above which would test the market value of Debtor's Equity Interest.  Debtor could also have filed a liquidating plan for a sale of its assets, which probably would have avoided application of the "absolute priority rule" as to the best price obtainable for the assets, assuming they were sold at a public auction or in some other permissible manner authorized by the Bankruptcy Code and

Federal Rules of Bankruptcy Procedure.  Another option for Debtor, in lieu of filing the Debtor Amended Plan, was to simply agree to the appointment of a Chapter 11 trustee or to a conversion of the case to Chapter 7.  This, of course, Debtor has been unwilling to do for over three (3) years.

Thus, given the enormous flexibility by this Court in allowing it Debtor to reorganize, in allowing a mediation procedure to go forward for resolution of the Bunch and McMasker Claims, and by granting prior extensions of the exclusivity periods, this Court has been more than fair to date with Debtor's reorganization process.  It is now time for the Court to conclude the process, as far as the Debtor is concerned, and deny confirmation of the Debtor Amended Plan.  This will allow the Court to consider the Proponents' Alternative Plan in December, 2004.

70.   Proponents reserve the right to amend and supplement this Objection pending discovery.

WHEREFORE, the Proponents of the Alternative Plan of Reorganization respectfully request that confirmation of the Debtor Amended Plan be denied; for the recovery of their costs and attorneys' fees; and, for all other proper relief to which they may be entitled.

Respectfully submitted,

Proponents of the Creditors'
Alternative Competing
Plan of Reorganization


 North American Pool
Company, a Nova Scotia Unlimited Liability
Company, d/b/a Cornelius Industries and its
wholly owned Subsidiary, Cornelius Pools,
LLC, a California Limited Liability
Company


By:   /s/  Ben F. Arnold_____
      Ben F. Arnold, Esq.
      111 Center Street, Suite 1300
      Little Rock, AR  72201



      Leesa Bunch, Creditor


By:   /s/James E. Smith, Jr,_____
      James E. Smith, Jr., Attorney



      McMasker Enterprises, Inc., Creditor


By:   /s/ James E. Smith, Jr._____
      James E. Smith, Jr., Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Ben F. Arnold, hereby certify that a copy of the foregoing Proponents of ~~Creditors'~~ Alternate Competing Plan of Reorganization Objection to Confirmation of Debtor's Amended Plan of Reorganization, has been sent by a combination of First Class Mail and electronic mail this 15th day of October, 2004.

U.S. Trustee
Attn: Jim Hollis, Attorney
200 West Capitol, Suite 1200
Little Rock, AR 72201

Legal Division
Dept. of Finance & Administration
P.O. Box 1272
Little Rock, AR 72203

Arkansas Dept. of Finance &
Administration Sales/Use Tax Department
P.O. Box 3861
Little Rock, AR 72203-3861

California State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279-8059

Internal Revenue Service
Fresno, CA 93888-0005

James F. Dowden
James F. Dowden, P.A.
212 Center Street, 10th Floor
Little Rock, AR 72201

C. Richard Crockett, Ltd.
Madden Law Firm
505 South Rock
Little Rock, AR 72202

Baldwin Steel Company
Attn: Dennis Star
P.O. Box 13283
Memphis, TN 38113-0283

McMasker Enterprises, Inc.
Attn: Jeffrey G. Nevin, Esq.
Jeffrey G. Nevin Law Corporation
50 California Street, Ste. 1500
San Francisco, CA 94111

Chief Insolvency Section
Internal Revenue Service
700 West Capitol Ave., Stop 5700
Little Rock, AR 72201

Arkansas Employment Security Division
P.O. Box 8007
Little Rock, AR 72203

California State Income Tax
Franchise Tax Board
P.O. Box 942857
Sacramento, CA 94279-8059

New Jersey Department of Labor
Employer Status Section
Room #305
Trenton, NJ 08625-0058

Stephen L. Gershner, Esq.
Davidson Law Firm, Ltd.
724 Garland Street
Little Rock, AR 72203

Gerard A. Jervis, Esq.
Law Offices of Gerard A. Jervis
407 Uluniu St., #101
Kailua, HI 96734

Production Serv. & Sales District Pension
c/o Groom Law Group
Attn: Ms. Lonie Hassel
1701 Pennsylvania, Ave., NW, #1200
Washington, DC 20006

Precoat Metals
Attn: Arthur W. Downs
13 1 0 Papin Street
St. Louis, MO 63103

Spectra Color, Inc.
Attn: Robert Shedd
7339 Quimby Street
Paramount, CA 90723

Legal Division
Employment Security Division
P.O. Box 2981
Little Rock, AR 72203

Arkansas Dept. of Finance &
Administration
Corporate Income Tax
P.O. Box 919
Little Rock, AR 72203-0919

California EDD
800 Capitol Mall
Sacramento, CA 95814

Florida Dept. of Labor & Employment
Security –
Div. Of Unemployment
Compo Caldwell Building, Room # 1 07
Tallahassee, FL 32399-0233

New Jersey Division of Taxation
CN 252
Trenton, NJ 08646-0252

Whitney A. Davis, Esq.
Charter Davis LLP
1515 K Street, Ste. 500
Sacramento, CA 95814

Formosa Plastics Corp.-U.S.A.
Attn: Bob Mularz
9 Peach Tree Hill Road
Livingston, NJ 07039

Becket & Lee (P A)
Becket & Lee, LLP
16 General Warren Boulevard
P. O. Box 3001
Malvern, PA 19355-701

A-TOP Polymers, Inc.
Attn: Georgianna Goodnough
47 Rockingham Road
Windham, NH 03087

Estate of Don Wofford
c/o Preston G. Hicky, Esq.
P. O. Box 1115
Forrest City, AR 72336

Phillips County Tax Collector
Attn: Ronnie White
P.O. Box 450
Helena, AR 72342

Stephen P. Hale, Esq.
Jennifer Powers, Esq.
Hale, Hedrick. Dewey, Wolf, Golwen
    Thornton & Chance, PLLC
200 Jefferson Ave., Suite 1450
Memphis, TN 38103

Charles T. Coleman, Esq.
Wright, Lindsey & Jennings, LLP
200 W. Capitol Ave., Ste. 2300
Little Rock. AR 72201

Frederick "Trip" Wetzel, III
Attorney at Law
1500 Riverfront Drive, Suite 104
Little Rock. AR 72202

U.S. Attorney
Eastern District of Arkansas
P.O. Box 1229
Little Rock, AR 72203

David A. Grace, Esq.
Hardin & Grace, P.A.
410 West 3rd St., Ste. 200
Little Rock, AR 72201

Jennifer Suttmoeller
Cervantes & Associates
1007 Olive Street, Fourth Floor
St. Louis, MO 63101

Ann Flaherty, Esq.
Law Offices of Michael Flaherty
1006 4th Street, Ste. 305
Sacramento, CA 95814-3301

Burton G. Klein
Klein, Klein and Dugas
210 Baronne Street, Suite 908
New Orleans, LA 70112

A. Michael Boggs
Attorney at Law
810 Tipton Street
Bossier City, LA 71111

John R. Jordan
Macissac & Co., Barristers & Solicitors
P.O. Box 445, Stn. A
503 Comox Road
Nanaimo, B.C. V9R 5L5 CANADA

Stan D. Smith, Esq.
Mitchell, Williams, Selig, Gates
   & Woodyard, PLLC
425 West Capitol, Suite 1800
Little Rock, AR  72203525

Timothy J. Buckley
Finley & Buckley, P.C.
2931 N. Druid Hills Rd., Ste. C
Atlanta, GA  30329

John B. Hayes
Hayes & Magrini
1229 North Walker Ave.
P.O. Box 60140
Oklahoma City, OK  73146

Robert J. Wenbourne
Foley & Lardner
1215 K Street, Suite 1920
Sacramento, CA  95814

Michael R. Jarman
Lavoie McCain & Jarman
15375 Barranca Parkway
Bldg. A, Suite 212
Irvine, CA  92618

Timothy B. Morgan
Attorney at Law
8855 South Ridgeland
Oaklawn, IL  60453

P. Keith O'Gorman
Burns, O'Gorman, Black & Weyland LLC
750 Rittiman Road
San Antonio, TX  78209

Garnett Wood Products Company
c/o Warren Harris
3315 East Ridgeview, Suite 1000
Springfield, MO  65804

Garry Michael Kann
Kann Capital LTD
2049 Century Park East, Suite 610
Los Angeles, CA  90067

/s/ Ben F. Arnold, Esq